801 S.E.2d 237

**IN RE: Remains of Chester Howard WEST**

**No. 16-0410**

Supreme Court of Appeals of West Virginia.

Submitted: February 15, 2017

Filed: June 6, 2017

Robert M. Bastress, Jr., Morgantown, West Virginia, Counsel for the Petitioner

John R. Teare, Jr., Spilman, Thomas & Battle, PLLC, Charleston, West Virginia, Counsel for the Respondent

WALKER, Justice:

This appeal arises from a petition filed in the Circuit Court of Mason County seeking authorization to disinter the remains of Chester Howard West, a World War I Medal of Honor recipient, and bury him with full military honors at the Gold Star Family Memorial Monument located within the Donel C. Kinnard Memorial State Veterans Cemetery in Institute, West Virginia ("Veterans Cemetery"). Hershel Woodrow Williams, a Medal of Honor recipient, filed the petition for Mr. West to be recognized as a recipient of the highest award a citizen can receive for bravery and valor. In an order dated March 23, 2016, the Circuit Court of Mason County granted Mr. Williams's petition.

Petitioner Roger VanSickle urges this Court to reverse the order below on the grounds that the circuit court lacks the authority to rule on the question of disinterment of Mr. West's remains. Alternatively, Mr. VanSickle argues that the circuit court abused its discretion in concluding that the equities favor disinterment over the wishes of the surviving spouse at the time of Mr. West's death and the living VanSickle family relatives.

Mr. Williams argues that the circuit court properly exercised its equitable jurisdiction and carefully balanced the equities in favor of disinterment of Mr. West's remains. He contends that Mr. West's remains should be moved to the Veterans Cemetery so that he is honored for his heroic service and his grave is properly maintained.

Upon consideration of the parties' briefs and arguments, the submitted record and pertinent authorities, we affirm the March 23, 2016 order of the Circuit Court of Mason County.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mr. West received the Medal of Honor for his heroic service in World War I. According to facts in the hearing record below and undisputed by the parties, he was a 20-year-old first sergeant in an automatic rifle section of the 363rd Infantry Regiment, United States Army's 91st "Wild West" Division. On September 26, 1918, the opening day of the Allies' Meuse-Argonne Offensive, Mr. West approached German lines near Bois-de-Cheppy, France. Mr. West's Medal of Honor citation stated:

> While making his way through a thick fog, his advance was halted by direct and unusual machine gun fire from two guns. Without aid, he at once dashed through the fire and, attacking the nest, killed two of the gunners, one of whom was an officer. This prompt and decisive hand-to-hand encounter on his part enabled his company to advance farther without the loss of a man.

After the war, Mr. West settled in Mason County, West Virginia and married Maggie Elizabeth VanSickle ("Maggie VanSickle") in 1932. On May 20, 1935, Sam McClausland fatally shot Mr. West while Mr. West was working on the McClausland farm in Mason County.

Maggie VanSickle had her husband buried in the VanSickle family cemetery, which is located now within the property encompassing the Chief Cornstalk Wildlife Management Area ("Cornstalk WMA") owned by the State of West Virginia. Once acquired by the State, the road leading to the VanSickle family cemetery was gated. With the passage of time, the road merged with the surrounding forest.

In 2015, a Boy Scout learned of Mr. West's Medal of Honor status and burial in Mason County and sought to locate the VanSickle family cemetery as an Eagle Scout project. The Boy Scout, with the help of family members and other scouts, located the cemetery and cleared it. The work included removal of a large oak tree that had fallen and damaged two of the headstones, including Mr. West's headstone.

Mr. Williams filed his petition on September 14, 2015, seeking authority under West Virginia Code §§ 37-13-1 through 7 (2015) to move Mr. West's remains from the VanSickle family cemetery to the Veterans Cemetery. According to Mr. Williams, his research through the Medal of Honor Foundation ("the Foundation") revealed no next of kin of Mr. West. He also represented that he confirmed that the remains of Mr. West were located in the VanSickle family cemetery, which had been overgrown and only discovered when recently cleared.

In Mr. VanSickle's answer to the Mr. Williams's petition, he noted that family members could have been identified by tax records, land records and phone records. He strenuously objected to moving Mr. West's remains from the VanSickle family cemetery, explaining that even though her husband was a distinguished Medal of Honor recipient, Maggie VanSickle chose to bury him in the family cemetery. Mr. VanSickle also represented that plans had been under way to clear the cemetery when the Boy Scout requested permission to do so as his Eagle Scout project.

The Circuit Court of Mason County conducted its hearing on February 29, 2016, and heard the testimony of five witnesses. Mr. Williams testified that he learned of a Medal of Honor recipient buried somewhere in Mason County from Keith Gwinn, the Secretary of the Department of Veterans Assistance [1] in approximately 2012. Several years later, he arranged through a friend to meet with another couple and walk into Cornstalk WMA to the cemetery. Mr. Williams testified it was quite a distance. He further testified that although Mr. West's headstone was broken into two pieces and was so worn by the weather it was difficult to make out, he was able to see part of the name and the unit within which Mr. West served.

---

1. In his testimony, Mr. Williams referred to Keith Gwinn as the Director of the Department of Veterans Affairs. In 2011, the Legislature eliminated the former Division of Veterans Affairs and created an agency entitled the Department of Veterans Assistance. Its administrative head is the cabinet secretary.

Mr. Williams also described that he had arranged for a funeral home to remove Mr. West's remains for reinterment in a new resting place. He testified that the Huntington Police Department would provide an escort and that the Veterans Cemetery would provide Mr. West with a gravesite and full military honors. All of these services would be provided at no cost, according to Mr. Williams.

When asked why he wanted to reinter Mr. West's remains, Mr. Williams testified as follows:

> Well, since he is a [M]edal of [H]onor recipient, having received the highest award that our country can give for bravery and valor, we feel that he is entitled to be in a location where people can recognize the service that he did for our country, and that he has earned the right to have a place where others can realize and recognize the fact that he is a hero. So I feel that the [Donel] C. Kinnard [C]emetery, our only West Virginia state veterans cemetery, would be a proper place[,] and they would certainly give all of the care, year-round care, to care for his gravesite.

Robert Sullivan, a police officer assisting the Foundation with information relating to the disinterment of Mr. West's remains, also testified at the hearing regarding the condition of the VanSickle family cemetery. Describing a 2015 trip with Mr. Williams, Mr. Sullivan testified that he only had GPS coordinates to find the cemetery. The road shown on the tax map was not actually there, so they were forced to walk. Mr. Sullivan further testified that the road to the cemetery had not been maintained since the State acquired the land. While walking in, they then came upon a man who told Mr. Sullivan that it had been twenty to thirty years since anyone had actually maintained the road. Mr. Sullivan testified that grass now covered the road. He commented that he never knew the road existed even though he has hunted in Cornstalk WMA for years. Mr. Sullivan stated that he and Mr. Williams walked on a worn path. He further described that the cemetery itself looked "reasonable" when they saw it in 2015 because Boy Scouts had cleaned it up for a project. Nonetheless, Mr.

Sullivan noted it was "just so isolated in the middle of nowhere."

Mr. VanSickle testified that Maggie VanSickle remarried and moved to Charleston where she died in 1950. He represented that Mr. West was his great uncle by marriage and that all the other witnesses opposing removal of Mr. West's remains have the same degree of relation as he has to Mr. West. Mr. VanSickle testified that to his knowledge Mr. West had no children or siblings. Mr. VanSickle agreed that the cemetery is a 50-by-65 foot private family cemetery located on State land. He also confirmed that several VanSickle family members are buried in that cemetery. Mr. VanSickle further stated that Maggie VanSickle decided to bury Mr. West at the family cemetery and for that reason, he felt Mr. West should remain there.

Doug Hudson testified that in 2003, the VanSickle family cemetery was in "bad shape." Mr. Hudson explained that the reason the cemetery was in that condition was because it was isolated and nobody could get there. He testified that he attempted to obtain a permit to bring equipment in to clean off the cemetery but was told by Cornstalk WMA officials that he had to walk in and carry his own equipment. He testified he cleaned it off several summers himself but could no longer do it. He further represented that he had some people to help him but could not get a permit. Mr. Hudson did not identify his relationship to Mr. West.

Carolyn Bailey testified that her mother was Maggie VanSickle's niece. Ms. Bailey testified that she firmly believed Maggie VanSickle would have wanted to be buried beside Mr. West. For this reason, Ms. Bailey testified she felt Mr. West's remains should stay in the VanSickle family cemetery. Ms. Bailey speculated that weather conditions in the winter of 1950 prevented Maggie VanSickle from being brought to Mason County for burial. Because more than eighty years had passed and the relatives do not believe that the wishes of Maggie VanSickle should be disregarded, Ms. Bailey suggested that a reasonable alternative would be to build a memorial in Mr. West's honor at the Veterans Cemetery.

On March 23, 2016, the circuit court granted Mr. Williams permission to enter "upon the lands of the State of West Virginia and into the VanSickle cemetery to carefully remove the remains of Chester Howard West therefrom, together with the headstone there situate and to re-inter such remains at the [Donel] C. Kinnard Cemetery at Institute, West Virginia." Mr. VanSickle appeals the circuit court's order.

## II. STANDARD OF REVIEW

We have long held that "[t]his Court reviews the circuit court's final order and ultimate disposition under an abuse of discretion standard. We review challenges to findings of fact under a clearly erroneous standard; conclusions of law are reviewed *de novo.*" Syl. Pt. 4, *Burgess v. Porterfield,* 196 W.Va. 178, 469 S.E.2d 114 (1996). We likewise find that in cases regarding disinterment of human remains, an abuse of discretion standard governs our review of the circuit court's final order and ultimate disposition in the exercise of its inherent powers in equity. *See State v. Highland,* 71 W.Va. 87, 92, 76 S.E. 140, 142 (1912) (no abuse of discretion when circuit court refused to allow disinterment of remains for evidentiary purposes in a murder trial).

## III. DISCUSSION

In his petition below, Mr. Williams requested authority to disinter and transfer Mr. West's remains under the provisions of West Virginia Code §§ 37-13-1 through -7 (2011), which establishes a process by which a party may seek authorization from the circuit court to remove human remains from a gravesite located on private land. However, based on the facts adduced during the hearing, the circuit court concluded that the provisions of West Virginia Code §§ 37-13-1 through -7 did not apply to this proceeding because Mr. West's remains were not located on private land.[2] The circuit court thus proceeded to act in equity, explaining:

Because there appears to be no specific statutory enactment which would address the factual circumstances herein, this Court may act in equity, with the inherent power to provide equitable relief to the Petitioner if the relief also is equitable to honor the memory of Chester Howard West.

After considering the facts and balancing the equities, the circuit court ordered that Mr. Williams may enter Cornstalk WMA and the VanSickle family cemetery "to carefully remove the remains of Chester Howard West" and lay them to rest at the Veterans Cemetery.

On appeal, Mr. VanSickle argues for the first time that there is a statutory prohibition against the circuit court's exercise of its equitable jurisdiction. In reliance upon *Hairston v. General Pipeline Construction, Inc.,* 226 W.Va. 663, 704 S.E.2d 663 (2010) (*Hairston I*), Mr. VanSickle asserts that West Virginia Code § 29-1-8a (2013) preempted the circuit court's common law jurisdiction to decide the issue of whether the remains of Mr. West should be disinterred and buried in another location.

In response, Mr. Williams argues that while the Legislature enacted West Virginia Code § 29-1-8a to prohibit disturbance of certain graves, it remains within the jurisdiction of the circuit court to rule in equity regarding the disinterment of Mr. West's remains. Moreover, Mr. Williams states that he is prepared through a qualified funeral director to obtain any permits that may be required.

West Virginia recognizes a common law right to petition the circuit court to resolve disputes involving the disinterment of human remains. In *Sherrard v. Henry,* 88 W.Va. 315, 106 S.E. 705 (1921), this Court reversed a circuit court's injunction preventing the disinterment of remains buried in another's claimed burial plot and found that the equities favored the party seeking disinterment. *Id.* at 322, 106 S.E. at 708. Resolving the issue of the power of the court to act in

---

**2.** West Virginia Code § 37-13-1 provides in relevant part that "[t]he circuit court of any county shall have jurisdiction and authority to permit and order the removal, transfer and re-inter-ment, or other disposition, of remains in any graves located upon privately owned land within the boundaries of such county...." W.Va. Code § 37-13-1.

equity, we noted that it is well established that "a court of equity will interfere to prevent desecration of places of burial of the dead or to prevent the removal of bodies properly buried. . . ." *Id.* at 319, 106 S.E. at 707. We further explained:

There is no property in a dead body, and, this being true, the law can afford no remedy in a case where the removal of such a body is sought or attempted. The courts do, however, recognize that, while there is no property in the body, the close relatives have a right to protect the same, and to prevent its removal or the desecration of the grave. This being true, there is no other remedy except resort to a court of equity when the removal of a dead body is attempted or threatened, and then such relief is granted as the circumstances require, and as is in consonance with the feelings of mankind.

*Id.* at 319-320, 106 S.E. at 707 (internal citations omitted). *See also, Highland,* 71 W.Va. at 89-90, 76 S.E. at 141 (request to disinter victim's remains for autopsy denied because relatives of deceased have quasi property right which the courts will protect); Syl. Pt. 1, *England & Bishop v. Central Pocahontas Coal Co.,* 86 W.Va. 575, 104 S.E. 46 (1920) (right to bury corpse and preserve remains is a quasi property right that may be redressed in courts in action for unlawful disinterment and desecration of gravesites).

■ Accordingly, the Circuit Court of Mason County had the authority under common law to rule on Mr. Williams's petition in equity. We next consider whether West Virginia Code § 29-1-8a preempted the circuit court's common law jurisdiction to decide the issue of whether the remains of Mr. West should be disinterred and buried in another location.

■ In *Hairston I,* we considered a certified question whether West Virginia Code § 29-1-8a preempted a common law cause of action for direct or indirect desecration of graves. We observed that "the statute discloses a clear legislative intent to preempt common law desecration claims with respect to the narrowly-defined matters identified and covered by the statutory protection."

*Hairston I,* 226 W.Va. at 670, 704 S.E.2d at 670. Accordingly, we held:

West Virginia Code § 29-1-8a (1993) preempts common law with respect to the matters specifically addressed in the statute. The statute preempts all common law claims involving "historic or prehistoric ruins, burial grounds, archaeological site, or human skeletal remains, unmarked grave, grave artifact or grave marker of historical significance." W. Va. Code § 29-1-8a(c)(1).

*Id.* at 665, 704 S.E.2d at 665, syl. pt. 2. However, we specifically noted that "[t]he preemptive effect of the statute applies *only* to the narrowly-defined categories of graves and other related items that the statute delineates." *Id.* at 670, 704 S.E.2d at 670 (emphasis added). We further explained that "common law is not preempted by the statute where the legislature has not specified statutory protection in West Virginia Code § 29-1-8a." *Id.*

We considered West Virginia Code § 29-1-8a again in *General Pipeline Construction, Inc. v. Hairston,* 234 W.Va. 274, 765 S.E.2d 163 (2014) (*Hairston II* ). The salient issue in *Hairston II* was whether West Virginia Code § 29-1-8a gave rise to a private cause of action for negligence. In holding that it does not, we relied in part upon the clear legislature purpose of West Virginia Code § 29-1-8a:

The stated legislative purpose of W.Va. Code § 29-1-8a(a) is to defend "the safety and sanctity of unmarked graves," so as to allow the "appropriate pursuit" of "worthy scientific and educational activities" by "those persons engaged in the scientific study or recovery of artifacts[.]" In other words, the statute is intended to protect the rights of people engaged in the scientific study of ancient, historic graves.

*Hairston II,* 234 W.Va. at 282-83, 765 S.E.2d at 171-72. We further concluded that the Legislature did not intend to infer the creation of a private cause of action. *Id.* at 283, 765 S.E.2d at 172.

Thus, in order to determine whether West Virginia Code § 29-1-8a preempted the circuit court's common law jurisdiction in the case before us, we examine whether Mr.

Williams's claim falls within "the narrowly-defined matters identified and covered by the statutory protection." *Hairston I*, 226 W.Va. at 670, 704 S.E.2d at 670. As we referenced in *Hairston II*, no conjecture or inference is necessary to ascertain the legislative purpose and scope of West Virginia Code § 29-1-8a. The statute plainly states:

> The Legislature finds that there is a real and growing threat to the safety and sanctity of unmarked human graves in West Virginia and the existing laws of the state do not provide equal or adequate protection for all such graves. As evident by the numerous incidents in West Virginia which have resulted in the desecration of human remains and vandalism to grave markers, there is an immediate need to protect the graves of earlier West Virginians from such desecration. Therefore, the purpose of this article is to assure that all human burials be accorded equal treatment and respect for human dignity without reference to ethnic origins, cultural backgrounds, or religious affiliations.

> The Legislature also finds that those persons engaged in the scientific study or recovery of artifacts which have been acquired in accordance with the law are engaged in legitimate and worthy scientific and educational activities. Therefore, this legislation is intended to permit the appropriate pursuit of those lawful activities.

> Finally, this legislation is not intended to interfere with the normal activities of private property owners, farmers, or those engaged in the development, mining or improvement of real property.

W. Va. Code § 29-1-8a(a). Clearly, the matter of whether the remains of a Medal of Honor recipient should be disinterred and moved to the Veterans Cemetery does not fall within the legislative purpose plainly stated in West Virginia Code § 29-1-8a. Mr. West's grave is not unmarked, has not been vandalized, and is not the subject of any scientific or educational study of artifacts.

We next consider whether Mr. West's grave is subject to the protection of West Virginia Code § 29-1-8a. Mr. VanSickle con-tends that Mr. West's headstone marking the location of his remains meets the statutory definition of "grave marker," which is defined as "any tomb, monument, stone, ornament, mound, or other item of human manufacture that is associated with a grave[.]" W.Va. Code § 29-1-8a(b)(4). Thus, he argues, the statute's directive that no person may "remove, destroy or otherwise disturb ... any grave marker of historical significance" applies. W.Va. Code § 29-1-8a(c)(1). Mr. VanSickle asserts that Mr. West's grave marker is "of historical significance" because he was a World War I Medal of Honor recipient. Accordingly, Mr. VanSickle asserts that Mr. Williams's claim is preempted by West Virginia Code § 29-1-8a.[3]

While Mr. West's grave marker may meet the statutory definition of "grave marker," the question we consider is whether it is "of historical significance" as that phrase is used in West Virginia Code § 29-1-8a(c)(1). The statute offers no definition of "historical significance" and Mr. VanSickle provides no analysis of the statutory meaning. However, we find that "historical significance" must be considered in the context of the clearly articulated purposes of the statute.

As discussed above, the Legislature articulated two purposes for West Virginia Code § 29-1-8a. The first purpose is to protect desecrated and vandalized graves left unmarked due to previous lack of respect for the sanctity of human remains. Second, the statute recognizes and permits the scientific study or recovery of artifacts. We consider the meaning of the term "historical significance" with those clear purposes in mind and find that Mr. West's grave marker is not protected by West Virginia Code § 29-1-8a. While Mr. West's service in World War I and his Medal of Honor are unquestionably significant in history, his grave marker does not fall within "the narrowly-defined matters identified and covered by the statutory protection" of West Virginia Code § 29-1-8a. *Hairston I*, 226 W.Va. at 670, 704 S.E.2d at 670. Accordingly, the claims of Mr. Williams are not preempted by West Virginia Code § 29-1-8a.

---

**3.** We note that Mr. VanSickle did not present this argument below or in his brief. Rather, coun-sel argued the preemptive effect of West Virginia Code § 29-1-8a solely during oral argument.

■ Finally, we consider Mr. VanSickle's argument that the circuit court abused its discretion in weighing the equities and granting Mr. Williams's petition. Mr. VanSickle asserts that the overriding factor controlling the decision to disinter the remains within a gravesite should be the wishes of the family. To the contrary, our prior case law establishes that while the family's quasi property right includes the possession and custody of the body for burial or other disposition, the custody of the remains after burial is in the law and must be resolved in the courts. *See Sherrard*, 88 W.Va. at 319-20, 106 S.E. at 707.

The Supreme Court of New Hampshire succinctly addressed the difficult subject of what courts should consider in disinterment cases as follows:

> The rights of relatives and friends respecting the care and control of the remains of their dead can be best determined and administered by the rule of reasonableness. The fact that jurisdiction over these matters is given to courts of equity is a persuasive reason why a liberal procedure in determining the rights of the parties should be adopted. There is nothing that touches more intimately the feelings and sensibilities of people than controversies relating to the disposal and control of the remains of their dead. And such methods should be adopted in dealing with these unfortunate disputes as are best calculated to reach just and equitable results, and to inflict the least trouble and distress upon the parties.

> The court in the trial of such an action, having found the facts, should be guided in making his decree by what is "fit and proper" to be done, taking into consideration all the special circumstances surrounding that particular case; due regard being given to the wishes of the decedent, the rights of relatives and friends, and the welfare of the public.

*Lavigne v. Wilkinson*, 80 N.H. 221, 223, 116 A. 32, 33 (1921). More recently, courts have accumulated a number of factors to be considered given the particular circumstances of a case:

There is no rigid rule for either permitting or refusing removal of a body once interred, and each case must be determined on its own merits. Thus, whether reasonable cause for reinterment has been shown will depend upon the respective weight, or persuasiveness, of a variety of factors. Among the factors that are to be given due regard in reinterment decisions are:

- the interests of the public
- the wishes of the decedent
- the rights and feelings of those entitled to be heard by reason of relationship or association with the decedent
- the degree of relationship to the decedent of those opposing or seeking disinterment
- the conduct of the parties seeking and opposing reinterment, especially as it relates to the circumstances of the original interment
- the integrity and capacity of the person seeking reinterment to provide a secure and comparable resting place for the decedent
- any agreement with, or regulations of, the persons or associations maintaining the cemetery in which the decedent is buried
- whether consent was given, by persons with authority to do so, to the burial in the first place of interment

22A Am. Jur. 2d Dead Bodies § 65 (2013). *See also, Maffei v. Woodlawn Memorial Park*, 130 Cal.App.4th 119, 124-125, 29 Cal. Rptr.3d 679, 683 (2005).

In a case involving facts similar to those before us, the Supreme Court of Appeals of Virginia found that a circuit court, exercising its power in equity, did not commit error in denying an injunction sought by family members opposed to disinterment of relatives. *Grinnan v. Fredericksburg Lodge No. 4 A.F. & A.M.*, 118 Va. 588, 88 S.E. 79, 80 (1916). The family members objected to the reburial of the remains of their loved ones in another site within the same Masonic Cemetery in order to make room for a memorial to George Washington, who became a Mason at that lodge. *Id.* at 79-80. Relying in part upon

the fact that "the condition of this cemetery for the past 50 years has been melancholy indeed," the *Grinnan* court affirmed the lower court's consideration of the equities, including the interests of Masons as well as the general public, over the interests of the few objecting family members. *Id.* at 81. The *Grinnan* court further noted that the dignity of the buried and their descendants would be honored in the disinterment and reburial process and that "the removal proposed in this case would, instead of desecrating the sepulcher of complainants' dead, rather tend to preserve and beautify their resting place." *Id.* at 80-81.

In the case before us, Mr. VanSickle argues that the equities favor reversing the circuit court's decision below because: (1) Maggie VanSickle's wishes were that her husband be buried in the VanSickle family cemetery; (2) the only surviving relatives of the couple strongly oppose disinterment of Mr. West's remains; (3) no evidence has been presented of other, closer next-of-kin, whose wishes differ from the surviving relatives; (4) the VanSickle family has been repeatedly denied access to Mr. West's gravesite to maintain it; and (5) other suitable alternatives exist to honor Mr. West without causing emotional injury to Mr. West's family.

Undeniably, the record contains no evidence of living blood relatives of Mr. West. While Mr. VanSickle filed an objection to Mr. Williams's petition to disinter Mr. West's remains and others testified at the hearing, all of those objecting to the removal have no direct, familial connection to Mr. West. Mr. West's surviving spouse remarried and died over sixty-five years ago, leaving no documented sentiment as to her own burial with her first husband. The VanSickle family cemetery is now overgrown and neglected in a remote section of a public wildlife management area owned by the State. To date, no one on Mr. West's behalf has asserted any right to enter into the Cornstalk WMA to provide upkeep to the cemetery and particularly the gravesite of this Medal of Honor recipient.

On the other hand, upon discovery of Mr. West's remains, Mr. Williams has expended time and energy to arrange for persons qualified to undertake Mr. West's disinterment with dignity and care, transport his remains with honor, reinter them with full military honors, and provide perpetual care for his gravesite. We understand that the VanSickle family has been denied the opportunity to enter Cornstalk WMA with the necessary equipment to keep the cemetery in the condition deserving of their loved ones. The fact remains that the cemetery where he is buried is in a location where perpetual care is highly unlikely. Mr. Williams has demonstrated the integrity and capacity to provide a most suitable and deserving resting place for Mr. West's remains. Accordingly, we hold that the Circuit Court of Mason County did not abuse its discretion in concluding that the equities favored the disinterment of the remains of Mr. West and granting the petition of Mr. Williams.

## IV. CONCLUSION

For the foregoing reasons, we affirm the March 23, 2016 order of the Circuit Court of Mason County.

Affirmed.

CHIEF JUSTICE LOUGHRY dissents and reserves the right to file a dissenting opinion.

JUSTICE WORKMAN dissents and reserves the right to file a dissenting opinion.

LOUGHRY, Chief Justice, dissenting:

" '[A]s to the dead, who are not here to answer for themselves, it would be the height of injustice and cruelty to disturb their ashes, and violate the sanctity of the grave[.]' " *Haudenschilt v. Haudenschilt,* 129 W.Va. 92, 121, 39 S.E.2d 328, 343 (1946) (Kenna, J., dissenting) (internal citation omitted). Yet, the majority of this Court has done just that and, in the process, they have opened Pandora's Box. Critically, "[g]ood intentions ... like bad facts[ ] sometimes make bad law." *Motorists Mut. Ins. Co. v. Huron Rd. Hosp.,* 73 Ohio St.3d 391, 653 N.E.2d 235, 239 (1995). Consequently, I am impelled to dissent.

Chester Howard West was a veteran of World War I. Prior to his death, his distin-

guished military service was recognized when he was awarded the Medal of Honor, the United States of America's highest military honor:

> The Medal of Honor is the highest award for valor in action against an enemy force which can be bestowed upon an individual serving in the Armed Services of the United States. [It is] [g]enerally presented to its recipient by the President of the United States of America in the name of Congress.

See http://www.cmohs.org/. Although Mr. West survived the war, he was murdered in 1935. At the express request of his widow, Maggie VanSickle West, Mr. West's body was laid to rest in her family's cemetery located in Mason County, West Virginia.

The respondent, Hershel Woodrow Williams, is also a Medal of Honor recipient, and he is associated with the Medal of Honor Foundation. Upon learning of Mr. West's status as Medal of Honor recipient, he became concerned that Mr. West's distinguished military service was not being adequately honored because the VanSickle family cemetery, including Mr. West's burial monument, were not being maintained.[1] Having neither a familial nor legal relationship to Mr. West, Mr. Williams nonetheless filed a petition in the circuit court seeking to exhume Mr. West's corporeal remains for the purpose of reinterment in The Donel C. Kinnard Memorial State Veterans Cemetery located in Institute, West Virginia.[2] Although Mr. Williams's intent and purpose were clearly honorable, the circuit court should have dismissed the petition on its face given the obvious lack of standing to file the action.

Under West Virginia law,

[s]tanding is comprised of three elements: First, the party attempting to establish standing must have suffered an "injury-in-fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent and not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct forming the basis of the lawsuit. Third, it must be likely that the injury will be redressed through a favorable decision of the court.

Syl. Pt. 5, *Findley v. State Farm Mut. Auto. Ins. Co.*, 213 W.Va. 80, 576 S.E.2d 807 (2002). Mr. Williams clearly cannot meet the *Findley* test. What is his injury, *i.e.*, what legally protected interest has been invaded? Further, what is the causal connection between the injury and the conduct? Other courts have been wisely circumspect in granting standing when the disinterment of a body is sought. *See, e.g., Grisso v. Nolen*, 262 Va. 688, 554 S.E.2d 91, 95–96 (2001) ("Dillard Nolen [former husband] was a legal stranger to Lorraine Nolen as the result of a divorce decree. As such, and notwithstanding what evidence he might have regarding Lorraine Nolen's wish as to the final resting place of her body, he had no cognizable interest in the place of her burial and, thus, no standing to seek the disinterment of her body for reburial."); *In re Elman*, 152 Misc.2d 656, 578 N.Y.S.2d 95 (N.Y. Sup. Ct. 1991) (finding decedent's sisters, his closest surviving next of kin, had standing to represent wishes of decedent and seek disinterment and reburial in a family plot); *In re Estate of Puder*, 2011 WL 112424 (N.J. Super. Ct. App. Div., Jan. 14, 2011) (finding decedent's mother had no standing under New Jersey rule and statute to challenge decedent's husband's decision to disinter decedent from crypt and bury decedent in Jewish section of cemetery in familial

---

1. The VanSickle family cemetery, once located on private property, is now within the Chief Cornstalk Wildlilfe Refuge owned by the State of West Virginia. Representations were made before the circuit court that the State has blocked the VanSickle family's efforts to access the cemetery for maintenance. I trust that such matters can be resolved so that the family may access the cemetery for visitation, decoration, and/or maintenance purposes.

2. Dedicated on May 31, 2012, the cemetery is operated by the West Virginia Department of Veterans Assistance. http://www.veterans.wv.gov/offices-facilities/Pages/Donel-C.-Kinnard-Memorial-State-Veterans-Cemetery-.aspx. Following federal guidelines and requirements for eligibility for burial, the cemetery provides "an honorable, dignified resting place for West Virginia's cherished veterans and their closest family members[,]" and it will be able to "accommodate burial space for approximately 60,000 qualified individuals." *Id.*

plot); *Sacred Heart of Jesus Polish Nat. C. Church v. Soklowski*, 159 Minn. 331, 199 N.W. 81, 82 (1924) (finding cemetery owner had standing to seek to enjoin disinterment, reasoning that "in guarding the repose of the dead there interred, and as interested in carrying out the expressed desire of its members as to their final resting place, we think there can be no question of plaintiff's right to maintain an action of this sort.").

Without regard for the clear absence of standing, and with no one to raise the issue since Roger Lee VanSickle, who responded to the petition on behalf of the family, was self-represented below, the circuit court proceeded to hold an evidentiary hearing on the petition. Familial descendants of Mr. West[3] testified that they did not want his remains to be disturbed as they were buried in the VanSickle family cemetery at the express request of his widow. Notwithstanding the family's opposition, and lacking any statutory authority to grant the petition,[4] the circuit court invoked its inherent power to rule in equity and ordered the exhumation of Mr. West's corporeal remains and reinterment in the veteran's cemetery in Institute so that his "memory is preserved as a recipient of the Medal of Honor." As discussed more fully below, there are other means through which this commendable goal may be realized.

It is incumbent upon us all to honor the lives of our veterans who have fought to safeguard our liberties and freedom. There is perhaps no higher cause than answering the call to defend one's country when peaceful resolutions fail. Recognizing the nearly immeasurable sacrifice made by our veterans, I am moved, as are so many West Virginians, by the hallowed grounds of our military cemeteries—not only those here at home but also those scattered around the globe.[5] As President John F. Kennedy, a highly-decorated veteran himself, once remarked: "I do not believe that any nation in the history of the world has buried its soldiers farther from its native soil than we Americans—or buried them closer to the towns in which they grew up." To this I can attest.

At different points in my life, I have been to many of these sacred venues both here and abroad. As a young man, I visited the Arlington National Cemetery in Virginia, which has been aptly called a place "where valor rests." Anyone who has witnessed the inimitable "Changing of the Guard" ceremony at the Tomb of the Unknown Soldier can speak to the solemnity of this consecrated place. Some years later, I had the privilege of visiting the Normandy American Cemetery and Memorial in France where I paid my respects to those lost during the Battle of Normandy, many of whom were killed on D–Day. The incredible emotion that rises up as you survey that picturesque yet tragic site

---

**3.** It appears that Mr. West has no consanguine descendants. The family members who appeared to oppose Mr. West's exhumation were related to him by marriage through his widow, who died in 1953. *See, e.g.,* W.Va. Code § 11–6B–2(3) (" 'Family member' means a person who is related by common ancestry, adoption or marriage including, but not limited to, persons related by lineal and collateral consanguinity.").

**4.** There are highly limited instances under West Virginia statutory law where a body may be disinterred, none of which are applicable in the instant matter. *See, e.g.,* W.Va. Code § 37–13–1 (providing that owner of private property may bring action seeking order allowing for disinterment of human remains on said property for reburial).

**5.** Thousands of our nation's servicemen and women are laid to rest in locations throughout the world. Just a few examples include the Aisne–Marne American Cemetery located in Belleau, Northern France, where 2,289 members of the United States military who died in World War I are buried; the Ardennes American Cemetery in Ardennes, Belgium, where the graves of 5,329 members of the United States military who died in World War II are located; the Brookwood American Cemetery in the British Isles and home to the graves of 468 members of the United States military who died in World War I; the Cambridge American Cemetery in Cambridge, England, which has approximately 3,812 graves of American military persons, including airmen who died over Europe and sailors from North Atlantic convoys; the Epinal American Cemetery located in Dinozé, France, which has graves of 5,255 United States' military who died in military campaigns during World War II; the Florence American Cemetery in Florence, Italy, which is home to 4,402 members of the United States military who died during World War II; and the Manila American Cemetery located in Manila, Philippines, where there are the graves of 17,206 U.S. personnel killed during World War II. *See* https://abmc.gov/cemeteries-memorials#.WLRD500zWos.

remains with you for a lifetime. From every angle and vantage point, the white crosses stand in perfect symmetry, each representing its own noble narrative about an American warrior who made the ultimate sacrifice for our nation. Such hallowed places serve as poignant reminders of the truly heart-rending cost of freedom.

We need not travel beyond our own state to find a place of such reverence built to accommodate for all eternity the finest among us. West Virginia has its own veterans cemeteries and, in my humble estimation, The Donel C. Kinnard Memorial State Veterans Cemetery is as beautiful and dignified a resting place as any veterans' cemetery in the world. It is indisputable that being laid to rest among fellow patriots in so honorable a place provides our West Virginia veterans with the respect befitting their service and sacrifice. Yet, we cannot lose sight of the fact that, both legally and equitably, the highest honor that can be bestowed on those who have fought for our freedoms is one which protects, not disrespects, their chosen final resting place.

Perhaps most important to this matter is the fact that there are other ways to honor Mr. West's distinguished military service and status as a Medal of Honor recipient short of instituting a legal proceeding seeking to compel his exhumation. As one family member suggested during her testimony, Mr. Williams could set a monument to honor the veterans of Mason County and leave Mr. West's remains undisturbed. In fact, there is a long tradition in this country of honoring those persons who have distinguished themselves in service to our country, but whose corporeal remains lay elsewhere.

Our nation's Capitol is home to numerous monuments, such as the Washington Monument, the Jefferson Memorial, and the Lincoln Memorial. Yet, President Washington is entombed at Mount Vernon; President Jefferson is buried at Monticello; and President Lincoln is entombed in Springfield, Illinois. Although the physical remains of these great men do not lay beneath their memorials in Washington, D.C., we honor and respect their service to this country through these commemorations. Another example is the Vietnam Memorial in Washington, D.C., on which the names of more than 58,000 Americans who gave their lives in service to our nation during the Vietnam War are inscribed. Clearly, we honor the service and sacrifice of each person on the Wall even though their bodily remains were laid to rest elsewhere.[6]

In short, the exhumation of Mr. West's earthly remains is completely unnecessary to fulfill Mr. Williams's admirable wish to honor Mr. West's distinguished military service. In fact, the circuit court's order references the Gold Star Family Memorial Monument established by the Medal of Honor Foundation within The Donel C. Kinnard Memorial State Veterans Cemetery. If that particular monument cannot be employed in some manner to honor Mr. West's memory and status as a Medal of Honor recipient, then perhaps another monument could be erected in the cemetery to honor not only Mr. West, but all West Virginians who receive the Medal of Honor but who either have been or will be laid to rest elsewhere.

Not only is the majority's decision both legally and equitably wrong, I am deeply concerned that a dangerous precedent has

6. In 1988, as a high school senior, I had the honor of participating in the Presidential Classroom, a week-long educational program held in Washington, D.C. Already possessing a deep respect for the brave and selfless service provided by this nation's veterans, including my father, who is an Air Force veteran, I was particularly moved by the memorials to our veterans that I visited that week. When later interviewed by the *Dominion Post* concerning my experience in our nation's capital, I shared my observations in visiting the Vietnam Memorial, as follows:

"Probably the most touching thing we saw was the Vietnam Memorial," [Loughry] said. "When you hear people talking [about] 58,-

000 people [who] died in that war, you say[,] 'That's a lot of people.' But to actually see the names written on the [wall] and see the parents, the brothers and sisters standing there and crying, it brings it home. It makes you think."

Kathy Plum, *Tucker student spends week in D.C.*, Dominion Post, April 24, 1988. The emotions experienced by me and many other students on that day more than twenty-nine years ago were felt because of the powerful and respectful manner through which those brave men and women were being honored, regardless of the fact that their corporeal remains were laid to rest elsewhere.

been set that threatens the sanctity of burial in this state. Will third-parties now have an imprimatur to seek the disinterment of any person with whom they have no relationship, either legal, familial, or otherwise, if their purpose is sufficiently laudable? Further, will a laudable purpose alone be sufficient, or will an ill-maintained cemetery also be required for court-ordered disinterment? Moreover, by what standards will a circuit court determine whether the purpose for disinterment is sufficiently commendable or whether a cemetery's maintenance is sufficiently inadequate to warrant disinterment?

Lastly, and to the extent the majority's holding extends the risk of a judicially ordered disinterment to any deceased person in this State, I would caution lawyers engaged in estate work to apprise their clients—veterans and non-veterans alike—that if they wish their final resting place to be just that—*final*—their wish needs to be explicitly set forth in their testamentary papers with the caveat that their corporeal remains never be moved absent particularized circumstances. Unlike Mr. West, there may not be someone to defend a decedent's final resting place, but perhaps a recorded will containing specific burial instructions would carry some weight when a legal action is instituted seeking to disinter a person twenty, fifty or, as in the case at bar, nearly a hundred years later.

For these reasons, I respectfully dissent.

WORKMAN, Justice, dissenting:

In this case, we confront the question of whether a person with honorable intentions but absolutely no personal connection to or familial relationship with a deceased person has a unilateral right to remove the deceased's remains, contrary to both the wishes of his widow and his remaining kin. The majority permits this result in the face of such familial objection ostensibly because it agrees that a stranger to the deceased will provide a resting place more befitting the deceased than his family.

An American hero, First Sergeant Chester Howard West (hereinafter "Sgt. West") was the recipient of the Congressional Medal of Honor for his courageous service at the age of 20 during battle as a member of the 363rd Infantry Regiment of the U.S. Army 91st Division. Sgt. West survived the war, but died seventeen years later, still a young man at age 37, leaving a young widow, Maggie VanSickle. Maggie made the decision to bury her husband in the VanSickle family cemetery in Mason County, and he has been at his eternal rest for now more than eighty-two years.

Hershel Woodrow Williams (hereinafter "Mr. Williams"), another American hero and recipient of the Congressional Medal of Honor, discovered that Sgt. West's gravesite was not well-cared for in the VanSickle family cemetery, which is located in a remote area of Mason County within the Chief Cornstalk Wildlife area which is owned and managed by the State. Mr. Williams unilaterally decided that Sgt. West's remains should be removed to the Donald C. Kinnard cemetery— a location which Mr. Williams believes to be a more honored resting place. The lower court and the majority permit this disinterment by Mr. Williams on the basis of a weighing of the equities, finding that the VanSickle family cemetery is not a "place of honor" and that by being removed to the Kinnard cemetery, he may be more appropriately honored and potentially re-connected with "lost family member[s]."

This analysis is simplistic and to some appealing, but there is a major obstacle to this reasoning: the important concept in American jurisprudence called "standing," which the majority does not even address. "The point of standing is to ensure that a person who asserts a position has a substantial legal right to do so[.]" *Cupp v. Bd. of Supervisors*, 227 Va. 580, 318 S.E.2d 407, 411 (1984) (internal citation omitted). More specifically, "[s]tanding requires that a party seeking relief have a *legally cognizable interest in the subject matter* and that he has a threatened or actual injury." *Eastern Mo. Laborers Dist. Council v. St. Louis Cty.*, 781 S.W.2d 43, 46 (Mo. 1989) (emphasis added). In this matter, despite his noble intentions, Mr. Williams lacks standing because he fails to articulate a legally cognizable interest and threatened or actual injury entitling him to remove Sgt. West's remains.

The United States Supreme Court has explained that "[t]o meet the standing requirements ... '[a] plaintiff must allege *personal injury* fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.' " *Raines v. Byrd*, 521 U.S. 811, 818–19, 117 S.Ct. 2312, 138 L.Ed.2d 849 (1997) (quoting *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (emphasis in original)). Articulating further, the United States Supreme Court has stated that such injury must "affect the plaintiff in a *personal* and *individual* way." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 n.1, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (emphasis added). While the importance of veterans' issues to Mr. Williams is well-known, being deeply involved in such issues is not tantamount to having a *"legally protected* interest" which is "concrete and particularized" and therefore actionable. *Id.* at 560, 112 S.Ct. 2130.

To be clear, standing is not merely a technical matter which can be overlooked when the equities of a matter militate against such consideration. Rather, standing goes to the very authority of a court to consider a matter. "Standing is a condition of justiciability that a plaintiff must satisfy in order to invoke the court's subject matter jurisdiction in the first place." *Bank of Am., N.A. v. Greenleaf*, 124 A.3d 1122, 1125 (Me. 2015). If a party lacks standing, the court must dismiss the case because it does not have jurisdiction over the issues presented. "Standing is a jurisdictional matter *antecedent to the right to relief.*" *Farmer v. Kinder*, 89 S.W.3d 447, 451 (Mo. 2002) (emphasis added); *see also Greenleaf*, 124 A.3d at 1125 ("A plaintiff's lack of standing renders that plaintiff's complaint nonjusticiable—i.e., incapable of judicial resolution.").

It is well-established that jurisdictional issues can be raised at any time, even *sua sponte* by this Court. "This Court, on its own motion, will take notice of lack of jurisdiction at any time or at any stage of the litigation pending therein." Syl. Pt. 2, *In re Boggs' Estate*, 135 W.Va. 288, 63 S.E.2d 497 (1951); *Greenleaf*, 124 A.3d at 1125 (observing that standing is "an issue cognizable at any stage of a legal proceeding[.]"). Furthermore,

"[t]he urgency of addressing problems regarding subject-matter jurisdiction cannot be understated because any decree made by a court lacking jurisdiction is void." *State ex rel. TermNet Merch. Servs., Inc. v. Jordan*, 217 W.Va. 696, 700, 619 S.E.2d 209, 213 (2005); *see also* Franklin D. Cleckley, Robin Jean Davis, and Louis J. Palmer, Jr., *Litigation Handbook on W.Va. Rules of Civ. Pro.*, § 12(b)(1), at 325–26 (4th ed. 2012) ("Any judgment or decree rendered without [subject matter] jurisdiction is utterly void.").

Other courts have properly considered the issue of standing in the context of disturbing the resting places of those souls who have passed. In *Grisso v. Nolen*, 262 Va. 688, 554 S.E.2d 91 (2001), the court addressed the issue of whether Mr. Nolen, who divorced the decedent prior to her death, had a sufficient legal interest in Ms. Nolen's wish regarding her final resting place so as to permit the court to invoke its equity authority to grant his petition. The court rejected the proposition that Mr. Nolen had any cognizable interest or legal standing with respect to matters concerning his former wife. It reasoned that Mr. Nolen "was a legal stranger" to Ms. Nolen "as the result of a divorce decree. As such, and notwithstanding what evidence he might have regarding [Ms.] Nolen's wish as to the final resting place of her body, he had no cognizable interest in the place of her burial and, thus, no standing to seek the disinterment of her body for reburial." *Id.* at 95.

The same rationale applies here. Mr. Williams has even less of a connection with Sgt. West; he in fact has none. Further because Mr. Williams never pled a judicially cognizable "injury" or other legitimate personal legal interest, the lower court had no jurisdiction to entertain the petition. Recently, the United States Supreme Court emphasized that "injury in fact" is an essential element to standing. *See Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016) ("To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical.") (quotation marks and citation

omitted). Accordingly, this Court should have reversed and remanded the matter to the lower court with directions to dismiss the petition for lack of subject matter jurisdiction.

The foregoing notwithstanding, even if we assume, *arguendo*, that Mr. Williams had standing, the lower court unmistakably abused its discretion in weighing the equities and granting the petition for disinterment considering the strong common law presumption in favor of repose. The majority blindly follows suit and, concluding that the family's lack of blood relationship to Sgt. West diminishes their interest in the matter, finds Mr. Williams' "integrity and capacity to provide a most suitable and deserving resting place" for Sgt. West dispositive. The majority is seemingly unaware of the irony of finding that the VanSickles' lack of "direct familial connection" [1] requires their wishes to subvert to those of Mr. Williams—a total stranger, legally and personally, to Sgt. West.

An appeal to equity requires a weighing of the factors or equities that affect the judgment—a function which requires the exercise of judicial discretion. Equity can, at times, do complete justice in the resolution of the controversy before the court, and the court will use the remedy in order to prevent the same controversy in the future. *See Fullerton Lumber Co. v. Torborg*, 274 Wis. 478, 80 N.W.2d 461, 465 (1957). However, the majority wholly fails to consider the strong common law presumption in favor of repose. Had it applied the appropriate standard, the majority would have held Mr. Williams to a heavy burden when he petitioned to disinter the remains of Mr. West against the wishes of his family. As summed up by one commentator:

> Despite the inconsistencies with which American cases on exhumation and removal of remains are rife, to this extent they all agree in principle: The normal treatment of a corpse, once it is decently buried, is to let it lie. This idea is so deeply woven into our legal and cultural fabric that it is commonplace to hear it spoken of as a "right" of the dead and a charge on the quick. Neither the ecclesiastical, common, nor civil system of jurisprudence permits exhumation for less than what are considered weighty, and sometimes compelling, reasons. Securing "unbroken final repose" has been the object of both civil and criminal legislation.

Peter Zablotsky, *"Curst Be He That Moves My Bones:" the Surprisingly Controlling Role of Religion in Equitable Disinterment Decisions*, 83 N.D. L. Rev. 361, 363 (2007) (footnotes, quotations, and citations omitted).

There is no doubt that we deal here with a most sensitive matter. Disputes regarding burial and disinterment touch deep-seated emotions and evoke strongly held personal and religious beliefs. Mr. Williams, a well-known Medal of Honor recipient, believes Mr. West's remains should be moved to the State Veterans Cemetery in Institute, West Virginia, so that he can be honored there for his service, and his grave can be properly maintained. On the other hand, Mr. Roger VanSickle, a great-nephew of Mr. West, and other family members believe that Mr. West should remain, at rest, in the family cemetery that is located within Chief Cornstalk Wildlife Management Area, in Southside, West Virginia. Mr. West's widow, Maggie VanSickle West, buried Mr. West in the family cemetery, and they assert her wishes must be respected. Notably, the family proposed an alternative that would have resolved this matter amicably: leave Mr. West's grave undisturbed and build a memorial in his honor at the Veterans Cemetery.

By rejecting this judicious proposition without explanation, the majority summarily concludes that: "Mr. Williams has demonstrated the integrity and capacity to provide a most suitable and deserving resting place for Mr. West's remains." Clearly, no one questions Mr. Williams' sincerity or integrity. In fact, I suspect the majority disregards the strong common law presumption in favor of repose in large part *because* Mr. Williams is held in such high esteem. However, in matters such as these, the Court must be especially on guard to apply the rule of law in a neutral manner. "The quiet of the grave, the repose of the dead, are not lightly to be

---

1. The VanSickles are relatives by marriage, rather than relatives by blood.

disturbed. Good and substantial reasons must be shown before disinterment is to be sanctioned." *Lipiner v. Plaza Jewish Cty. Chapel*, 41 N.Y.S.3d 384, 387, 53 Misc.3d 1080 (N.Y. Sup. Ct. 2016) (citation omitted).

There is hundred-year-old case law recognizing a strong common law presumption in favor of repose. In fact, since antiquity, most societies have held burial grounds in great reverence. *See Memphis State Line R.R. v. Forest Hill Cemetery Co.*, 116 Tenn. 400, 94 S.W. 69, 73 (1906) (observing that repositories of dead are regarded with veneration); *Mills v. Carolina Cemetery Park Corp.*, 242 N.C. 20, 86 S.E.2d 893, 898 (1955) (accord). The early common law protected the sanctity of the grave by recognizing the "right" to a decent burial and the "right" to undisturbed repose. *Carney v. Smith*, 222 Tenn. 472, 437 S.W.2d 246, 247 (1969); *Thompson v. State*, 105 Tenn. 177, 58 S.W. 213, 213 (1900). Accordingly, unless a good and substantial reason existed, the common law strongly disfavored disturbing a body once it had been suitably buried. In the words of Justice Cardozo, then a member of the New York Court of Appeals, "[t]he dead are to rest where they have been laid unless reason of substance is brought forward for disturbing their repose." *Yome v. Gorman*, 242 N.Y. 395, 152 N.E. 126, 129 (Ct. App. 1926).

The majority ignored fundamental rules of law when it did not properly recognize the substantial rights of the VanSickle family to honor the decision of their ancestor, Mr. West's widow. By reason of their familial relationship with the decedent, their wishes are of paramount importance.

First. That the paramount right is in the surviving husband or widow, and, if the parties were living in the normal relations of marriage, it will require a very strong case to justify a court in interfering with the wish of the survivor. Secondly. If there is no surviving husband or wife, the right is in the next of kin in the order of their relation to the decedent, as children of proper age, parents, brothers and sisters, or more distant kin, modified, it may be, by circumstances of special intimacy or association with the decedent. Third[.] How far the desires of the decedent should prevail against those of a surviving husband or wife is an open question, but as against remoter connections, such wishes especially if strongly and recently expressed, should usually prevail. Fourthly. *With regard to a reinterment in a different place, the same rules should apply, but with a presumption against removal growing stronger with the remoteness of connection with the decedent*, and reserving always the right of the court to require reasonable cause to be shown for it.

*Pettigrew v. Pettigrew*, 207 Pa. 313, 56 A. 878, 880 (1904) (emphasis added); *see also Mallen v. Mallen*, 520 S.W.2d 736, 737–38 (Tenn. Ct. App. 1974) (stating "the wishes of the spouse seem to command first consideration"). The majority places undue emphasis on the fact that the VanSickle family is related to Mr. West by marriage, not blood, because Mr. West had no biological children. This distinction is completely irrelevant. The VanSickle family is *still* Mr. West's family. In contrast, Mr. Williams—although he petitions with laudable purpose—is a legal stranger to the West/VanSickle family.

Even though he prevailed in this case, I encourage Mr. Williams to reconsider his position, respect the wishes of the VanSickle family, and leave Sgt. West's remains where they have been laid to rest. The most excellent way to honor our nation's brave military heroes who sacrificed to preserve our freedoms is to follow the rule of law, without fear or favor. The majority has failed to do so. Accordingly, I respectfully dissent.